09-2790-cv
GSI Commerce Solutions v. BabyCenter

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

AUGUST TERM, 2009

(Argued: December 3, 2009          Decided:   August 18, 2010)

Docket No. 09-2790-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GSI COMMERCE SOLUTIONS, INC.,

    Petitioner-Appellant,

    v.

BABYCENTER, L.L.C.,

    Respondent-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, RAGGI, and LIVINGSTON, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) granting a motion to disqualify petitioner's counsel. We affirm. Counsel currently represents respondent's parent company, and respondent and the parent company are so closely related that they are essentially one client for disqualification purposes. Counsel has thus engaged in concurrent representation, which it may not do without the parent company's consent. Counsel had not obtained such consent. We therefore affirm.

REBECCA D. WARD (James T. Smith & Leonard D. Steinman, Blank Rome, LLP, Philadelphia, Pennsylvania; Raymond L. Fitzgerald, Butler, Fitzgerald, Fiveson & McCarthy, P.C., New York, New York on the brief), Blank Rome, LLP, Philadelphia, Pennsylvania, for Petitioner-Appellant.

JOHN D. WINTER (Claude S. Platton on the brief) Patterson Belknap Webb & Tyler, LLP, New York, New York, for Respondent-Appellee.

WINTER, Circuit Judge:

GSI Commerce Solutions, Inc. ("GSI") appeals from Judge Rakoff's order granting a motion by BabyCenter, LLC ("BabyCenter"), a wholly-owned subsidiary of Johnson & Johnson, Inc. ("J&J"), to disqualify Blank Rome, LLP, as GSI's counsel. The court concluded that the doctrine forbidding concurrent representation without consent applies because the relationship between BabyCenter and J&J, which Blank Rome represents in other matters, is so close that the two are essentially one client for disqualification purposes. The district court therefore disqualified Blank Rome from representing GSI in the instant matter because the law firm had not obtained consent from J&J.

We affirm.

BACKGROUND

a) Attorney-Client Relationship between Johnson & Johnson and Blank Rome

2

J&J entered into an Engagement Agreement with Blank Rome in 2004. The agreement, contained in a letter to J&J ("2004 Letter"), describes the scope of Blank Rome's representation as limited to compliance matters involving J&J and J&J affiliates "in connection with the European Union . . . Data Protection Directive and potential certification to the U.S. Safe Harbor." The bulk of the agreement concerns two provisions purporting to waive certain conflicts of interest. The first provision addresses Blank Rome's concurrent representation of Kimberly-Clark in a specific patent matter "adverse to [J&J's] corporate affiliate, McNeil PPC, Inc." Specifically, it sets out the Rules of Professional Conduct applicable to attorneys representing an enterprise with diverse operations and concludes that Blank Rome is free to continue to represent Kimberly-Clark in that matter so long as J&J agrees to waive the conflict.

The second provision in the 2004 Letter to J&J seeks a prospective waiver of all conflicts arising out of Blank Rome's representation of Kimberly-Clark in patent matters adverse to J&J and affiliates. The prospective waiver provision provides:

> We believe that if, in the future, our firm were requested by Kimberly-Clark to represent it in patent matters related to Johnson & Johnson or its affiliates or subsidiaries, our representation of Johnson & Johnson in the Data Protection Matters and in other unrelated matters and our present and future representation of Kimberly-Clark would

3

> not adversely affect our relationship with either client. . . .
>
> Specifically, this letter seeks confirmation that, should our representation of Kimberly-Clark in connection with patent-related proceedings involve Johnson & Johnson, or any other entity related to Johnson & Johnson, Johnson & Johnson consents, and will not object, to our continuing representation of Kimberly-Clark in connection with these proceedings . . . .

A final part of the 2004 Letter summarizes the terms of the two waivers and directly asks J&J to acknowledge that "you are aware of the conflict of interests that results from our representation of Kimberly-Clark and Johnson & Johnson but that notwithstanding that conflict . . . you consent to our representation of Johnson & Johnson and our simultaneous continued representation of Kimberly-Clark." Blank Rome also attached a standard Addendum, which provides in relevant part:

> Unless otherwise agreed to in writing or we specifically undertake such additional representation at your request, we represent only the client named in the engagement letter and not its affiliates, subsidiaries, partners, joint venturers, employees, directors, officers, shareholders, members, owners, agencies, departments or divisions. If our engagement is limited to a specific matter or transaction, and we are not engaged to represent you in other matters, our attorney-client relationship will terminate upon the completion of our services with respect to such matter or transaction whether or not we send you a letter to confirm the termination of our representation.

4

In 2005, Blank Rome sent another letter to J&J ("2005 Letter") seeking to amend the terms of the Engagement Agreement. The 2005 Letter first explains that Blank Rome had increased its representation of generic drug manufacturers in patent-related matters. It specifically notes that the firm's representation of these new clients could lead to conflicts with its existing clients, such as J&J, that are known as branded drug manufactures. The 2005 Letter then states: "The Addendum to our current engagement letter stipulates that we represent only [J&J], and not its affiliates, subsidiaries, partners, divisions and joint venturers." However, the Letter goes on to request the following waiver from J&J:

> Specifically, this letter seeks confirmation that, should our representation of generic drug manufacturers in connection with patent-related proceedings involve Johnson & Johnson, or any other entity related to Johnson & Johnson, Johnson & Johnson consents, and will not object, to our continuing representation of the generic drug manufacturers in connection with these proceedings, and should we determine that our withdrawal as counsel is necessary for us under the Rules of Professional Conduct to continue to represent the generic drug manufacturers, Johnson & Johnson consents, and will not object, to our firm's withdrawal at such time.

A final part of the 2005 Letter specifically asks J&J to acknowledge: "you [J&J] provide your prospective consent to our [Blank Rome's] representation of generic drug manufacturers in

5

patent-related proceedings involving Johnson & Johnson and its affiliates and subsidiaries."

Pursuant to this Engagement Agreement, Blank Rome advised J&J on a variety of privacy matters, much of which was related to J&J affiliates. In particular, Jennifer Daniels, a partner at Blank Rome, provided affiliates with privacy-related services, including the preparation of policies and procedures, guidance documents, and training materials. In 2006, Ms. Daniels represented BabyCenter in a privacy-related matter. Blank Rome did not, however, advise J&J with regard to the E-Commerce Services Agreement ("E-Commerce Agreement") between BabyCenter and GSI, which is the subject of the current litigation. It also appears that Blank Rome received no confidential information relevant to that agreement during its representation of J&J or, separately, BabyCenter.

b)  J&J's Relationship with BabyCenter

BabyCenter is a wholly-owned subsidiary of J&J that operates as an online media company. BabyCenter hosts a variety of websites in the United States and abroad that focus on pregnancy and early childhood development. Until January 2009, BabyCenter also hosted an online retail store offering baby-care and related products.

BabyCenter relies on J&J for a variety of business services, including accounting, audit, cash management, employee benefits,

finance, human resources, information technology, insurance, payroll, and travel services and systems. It also substantially relies on J&J's legal department either to provide legal services or to secure outside counsel. Stuart Wilks, a member of the J&J legal department, serves as "Board Attorney" to BabyCenter. J&J's legal department participated in the negotiation of the E-Commerce Agreement between BabyCenter and GSI. J&J lawyers have also been involved from the beginning in the dispute between BabyCenter and GSI. Indeed, J&J's legal department has dealt directly with Blank Rome in attempting to resolve the present dispute.

Finally, it appears that J&J exercises some management control over BabyCenter's business decisions, although the extent of this control is not clear from the record. BabyCenter is a limited liability company. Its sole member is BC Acquisition group, which is itself a wholly-owned subsidiary of J&J. J&J structures affiliates into groups of companies. BabyCenter belongs to the Consumer Healthcare Group and its operations are supervised by the Consumer Healthcare Group Operating Committee, which is composed mainly of J&J employees.

c) BabyCenter & GSI Commerce Solutions

BabyCenter and GSI entered into the aforementioned E-Commerce Agreement in August 2006, pursuant to which GSI agreed to run the day-to-day operations of BabyCenter's online store in

7

return for a percentage of sales revenue. Section 10.10 of the E-Commerce Agreement provides that, if a dispute should arise, the parties will first attempt to resolve it through mediation. Should mediation fail, the agreement provides that the parties will proceed to arbitration.

When BabyCenter closed its online store in 2009, GSI accused it of wrongfully terminating the E-Commerce Agreement. Specifically, it argued that the five-year term of service in the agreement had not expired at the time the store closed. James Smith, a Blank Rome partner, notified BabyCenter on December 1, 2008 of GSI's demand for mediation on its claim. Daniels, the Blank Rome partner who had worked with J&J and affiliates on privacy matters, contacted J&J's legal department the same day to inform J&J of the dispute. In January 2009, the parties attempted mediation. Blank Rome partners Smith and Rebecca Ward appeared on behalf of GSI. Members of the J&J legal department, as well as John Winter (no relation to the author of this opinion) from the firm Patterson Belknap Webb & Tyler LLP, appeared on behalf of BabyCenter at mediation.

Mediation efforts proved unsuccessful. On February 27, 2009, Winter informed GSI that BabyCenter would not continue to arbitration so long as Blank Rome represented GSI. On the same day, J&J informed Blank Rome of its opposition to Blank Rome's representation of GSI.

d) <u>The District Court Proceedings</u>

On April 6, 2009, in light of BabyCenter's failure to arbitrate, GSI filed a motion in the Southern District to compel arbitration. BabyCenter responded with a cross-motion to disqualify Blank Rome as counsel, arguing that its representation of GSI presented a concurrent conflict to which J&J had not given its consent.

The district court granted BabyCenter's motion to disqualify Blank Rome. <u>GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.</u>, 644 F. Supp. 2d 333 (S.D.N.Y. 2009). Although Blank Rome's separate representation of BabyCenter allegedly ended in 2006, <u>see</u> <u>id.</u> at 336, the court concluded that BabyCenter still "must be considered a current client of Blank Rome for purposes of disqualification," <u>id.</u> at 337, because "BabyCenter and J&J must be considered essentially the same client for purposes of the instant litigation." <u>Id.</u> at 336. <u>See</u> <u>also</u> <u>id.</u> ("Although technically BabyCenter is a wholly owned subsidiary of J&J, as a practical matter it is part and parcel of J&J.") (citation omitted). In so ruling, the court focused on the evidence of substantial operational commonality between BabyCenter and J&J, but particularly on BabyCenter's reliance on J&J to provide legal services. <u>See</u> <u>id.</u> at 336-37. The court further found it relevant that, "since BabyCenter is a wholly owned subsidiary, its liabilities directly impact J&J's." <u>Id.</u> at 337.

9

The court found that the Engagement Agreement had not given Blank Rome broad authority to accept representation adverse to affiliates such as BabyCenter. See id. at 336. Instead, it noted that the agreement "itself contains prospective waivers of certain conflicts, thus indicating (at least implicitly) that Blank Rome was aware of the potential conflict of interest that would be posed by its representation of interests adverse to J&J and its subsidiaries." Id.

The district court proceeded to disqualify Blank Rome on the ground that it had not obtained consent to the concurrent representation. See id. at 338.

DISCUSSION

a) Standard of Review

We review a district court order disqualifying an attorney for an abuse of discretion. See Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 750 (2d Cir. 1981). Matters of law are reviewed de novo and factual findings are sustained unless clearly erroneous. Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir. 2001). We will affirm the court's application of the law to the facts unless the court's findings "cannot be located within the range of permissible decisions." Id. In addition, to the extent we need to interpret the Engagement Agreement between J&J and Blank Rome, its construction is a question of law unless the agreement's meaning is ambiguous. See JA Apparel Corp. v.

10

*Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). An agreement is ambiguous only if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987).

b) The Corporate Affiliate Conflict

In deciding whether to disqualify an attorney, a district court must balance "a client's right freely to choose his counsel" against "the need to maintain the highest standards of the profession." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005). Although the American Bar Association ("ABA") and state disciplinary codes provide valuable guidance, a violation of those rules may not warrant disqualification. *See* *id.* Instead, disqualification is warranted only if "an attorney's conduct tends to taint the underlying trial." *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (internal quotation marks and citations omitted). One established ground for disqualification is concurrent representation, an attorney's simultaneous representation of one existing client in a matter adverse to another existing client. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976). Because concurrent representation is "prima facie improper," it is incumbent upon the attorney to "show, at the

11

very least, that there will be no actual or <u>apparent</u> conflict in loyalties or diminution in the vigor of his representation." <u>Id.</u> at 1387. We have noted that this is "a burden so heavy that it will rarely be met." <u>Glueck</u>, 653 F.2d at 749. In this respect, it will not suffice to show that the two matters upon which an attorney represents existing clients are unrelated. "The lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed." <u>Cinema 5</u>, 528 F.2d at 1386.

We have not previously considered whether, and under what circumstances, representation adverse to a client's corporate affiliate implicates the duty of loyalty owed to the client. However, the issue has been addressed by the ABA and also has been discussed extensively in other courts.

The ABA's Model Rules of Professional Conduct provide that a "lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary." ABA Model Rule of Prof'l Conduct 1.7 cmt. 34 (2006). This statement embodies what is often termed the "entity theory" of representation. <u>See</u> Charles W. Wolfram, <u>Legal Ethics: Corporate-Family Conflicts</u>, 2 J. Inst. Study Legal Ethics 295, 307 (1999). However, an attorney may not accept representation

12

adverse to a client affiliate if "circumstances are such that the affiliate should also be considered a client of the lawyer . . . ." ABA Model Rule of Prof'l Conduct 1.7 cmt. 34 (2006). The ABA discussed this subject further in a 1995 Opinion Letter, concluding that "whether a lawyer represents a corporate affiliate of his client . . . depends not upon any clearcut per se rule but rather upon the particular circumstances." Am. Bar Ass'n Comm. on Prof'l. Ethics, Formal Opinion 95-390 (1995), reprinted in ABA/BNA Lawyers Manual on Prof'l. Conduct Ethics Opinions 1991-95, pp. 1001:262 (1996).

Many courts have reached the conclusion that the bar to concurrent representation applies if a firm's representation adverse to a client's corporate affiliate "reasonably diminishes the level of confidence and trust in counsel held by [the client]." Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co., 264 F. Supp. 2d 914, 922 (N.D. Cal. 2003) (internal quotation marks omitted); see also Discotrade Ltd. v. Wyeth-Ayerst Int'l, Inc., 200 F. Supp. 2d 355, 358-59 (S.D.N.Y. 2002); Hartford Accident & Indem. Co. v. RJR Nabisco, Inc., 721 F. Supp. 534, 540-41 (S.D.N.Y. 1989); John Steele, Corporate-Affiliate Conflicts: A Reasonable Expectations Test, 29 W. St. U. L. Rev. 283, 311-13 (2002). Put another way, these courts focus on the reasonableness of the client's belief that counsel cannot maintain the duty of undivided loyalty it owes a client in

13

one matter while simultaneously opposing that client's corporate affiliate in another. See, e.g., Certain Underwriters at Lloyd's, London, 264 F. Supp. 2d at 922; Discotrade Ltd., 200 F. Supp. 2d at 358-59.

We agree that representation adverse to a client's affiliate can, in certain circumstances, conflict with the lawyer's duty of loyalty owed to a client, a situation that we shall refer to as "a corporate affiliate conflict."

The factors relevant to whether a corporate affiliate conflict exists are of a general nature. Courts have generally focused on: (i) the degree of operational commonality between affiliated entities, and (ii) the extent to which one depends financially on the other. As to operational commonality, courts have considered the extent to which entities rely on a common infrastructure. See, e.g., Discotrade Ltd., 200 F. Supp. 2d at 359 (corporate affiliates deemed single entity where each used the same computer network, e-mail system, travel department, and health benefit plan); Eastman Kodak Co. v. Sony Corp., Nos. 04-CV-6095, 04-CV-6098, 2004 WL 2984297, at 3-4 (W.D.N.Y. Dec. 27, 2004) (corporate affiliates deemed single entity based on, inter alia, integration of technology systems). Courts have also focused on the extent to which the affiliated entities rely on or otherwise share common personnel such as managers, officers, and directors. See, e.g., Certain Underwriters at Lloyd's, London,

14

264 F. Supp. 2d at 923 (substantial overlap in management); Eastman Kodak, 2004 WL 2984297, at *4 (shared directors, officers and legal department); Discotrade Ltd., 200 F. Supp. 2d at 359 (same board, directors and President). In this respect, courts have emphasized the extent to which affiliated entities share responsibility for both the provision and management of legal services. See Eastman Kodak, 2004 WL 2984297, at *4; Certain Underwriters at Lloyd's, London, 264 F. Supp. 2d at 923-24; Discotrade Ltd., 200 F. Supp. 2d at 357; Hartford Accident and Indem. Co., 721 F. Supp. at 540; Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, 69 Cal. App. 4th 223, 231 (Cal. App. 1st Dist. 1999). This focus on shared or dependent control over legal and management issues reflects the view that neither management nor in-house legal counsel should, without their consent, have to place their trust in outside counsel in one matter while opposing the same counsel in another.

As to financial interdependence, several courts have considered the extent to which an adverse outcome in the matter at issue would result in substantial and measurable loss to the client or its affiliate. See Hartford Accident and Indem. Co., 721 F. Supp. at 540; Wolfram, 2 J. Inst. Study Legal Ethics at 357-58. Courts have also inquired into the entities' ownership structure. See Discotrade Ltd., 200 F. Supp. 2d at 358-59. Some have even suggested that an affiliate's status as a wholly-owned

15

subsidiary of the client may suffice to establish a corporate affiliate conflict. Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB, 944 F. Supp. 341, 346 (D.N.J. 1996) ("[T]here is sufficient case law which supports the proposition that, for conflict purposes, representation of a subsidiary corporation is equivalent to representation of its parent, and vice-versa . . . ."); Stratagem Dev. Corp. v. Heron Int'l N.V., 756 F. Supp. 789, 792 (S.D.N.Y. 1991) (treating the entities as one client because "the liabilities of a [wholly-owned] subsidiary corporation directly affect the bottom line of the corporate parent"). However, we agree with the ABA that affiliates should not be considered a single entity for conflicts purposes based solely on the fact that one entity is a wholly-owned subsidiary of the other, at least when the subsidiary is not otherwise operationally integrated with the parent company. See American Bar Ass'n Comm. on Prof'l. Ethics, Formal Opinion 95-390 at 1001:261-62.

However, the record here establishes such substantial operational commonalty between BabyCenter and J&J that the district court's decision to treat the two entities as one client was easily within its ample discretion. First, Babycenter substantially relies on J&J for accounting, audit, cash management, employee benefits, finance, human resources, information technology, insurance, payroll, and travel services

16

and systems. Second, both entities rely on the same in-house legal department to handle their legal affairs. The member of J&J's in-house legal department who serves as "board lawyer" for BabyCenter helped to negotiate the E-Commerce Agreement between BabyCenter and GSI that is the subject of the present dispute. Moreover, J&J's legal department has been involved in the dispute between GSI and BabyCenter since it first arose, participating in mediation efforts and securing outside counsel for BabyCenter. Finally, BabyCenter is a wholly-owned subsidiary of J&J, and there is at least some overlap in management control.

When considered together, these factors show that the relationship between the two entities is exceedingly close. That showing in turn substantiates the view that Blank Rome, by representing GSI in this matter, "reasonably diminishes the level of confidence and trust in counsel held by" J&J. Certain Underwriters at Lloyd's, London, 264 F. Supp. 2d at 922 (internal quotation marks omitted).[1]

c) _J&J Did Not Waive the Corporate Affiliate Conflict_

---

[1] These factors are not clearly outweighed by those that would support a different conclusion. It is true that the dispute between GSI and BabyCenter is unrelated to the matters upon which Blank Rome represents J&J. Also, J&J and BabyCenter do not publicly present themselves as a single legal entity; in fact, the E-Commerce Agreement at issue here expressly forbids GSI from representing that J&J is one of its strategic partners. GSI also claims that the court should have given more weight to the fact that J&J is not financially dependent on BabyCenter. BabyCenter is only one of many J&J affiliates and does not account for much of J&J's revenue. But, given the extent of J&J's and BabyCenter's operational commonality, the district court did not abuse its discretion in giving these counter factors little weight.

17

GSI argues that, with the Engagement Letter, J&J and Blank Rome dispositively waived the corporate affiliate conflict.

We agree that a law firm may ordinarily accept representation involving a corporate affiliate conflict if the client expressly consents. In the criminal context, we have said that courts should generally respect a party's decision to "waive his right to conflict-free counsel in order to retain the attorney of his choice." United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002). That principle has even greater force in the context of private litigation where the Sixth Amendment does not apply. This view has also been embraced by courts and commentators. See American Bar Ass'n Comm. on Prof. Ethics, Formal Opinion 95-390 at 1001:262 ("The best solution to the problems that may arise by reason of clients' corporate affiliations is to have a clear understanding between lawyer and client, at the very start of the representation, as to which entity or entities in the corporate family are to be the lawyer's clients, or are to be so treated for conflicts purposes."); Ass'n of the Bar of the City of New York Comm. on Prof'l and Judicial Ethics, Formal Opinion 2007-3 ("[C]orporate-family conflicts may be averted by . . . an engagement letter . . . that delineates which affiliates, if any, of a corporate client the law firm represents . . . ."); Wolfram, 2 J. Inst. Study Legal Ethics at

18

364 ("[D]iscrete agreements between a lawyer and corporate-family client can define the relationship in such a way as to limit . . . the type of conflict obligations that the lawyer is and is not undertaking.").[2]

However, Blank Rome failed to obtain J&J's consent to the instant corporate affiliate conflict.[3] Although certain provisions of the Engagement Agreement may constitute a waiver by J&J of certain corporate affiliate conflicts, they do not waive the conflict at issue here. Specifically, the waiver is strictly limited to matters involving patent litigation and, even then, only to matters brought by either Kimberly-Clark or a generic drug manufacturer. Thus, because these provisions acknowledge Blank Rome's continuing duty to avoid conflicts arising out of its representation of J&J and third parties, and because the instant matter does not fall into the narrow category of cases

---

[2]We need not exclude the possibility that some corporate affiliate conflicts pose such a threat to the integrity of the adversarial process that a court could, in its sound discretion, determine that the conflict is not waivable. But since neither party directs us to evidence suggesting that is the case, we assume that J&J's consent to such representation would have been dispositive of the disqualification motion.

[3]GSI argues that BabyCenter and J&J have forfeited any right to contest Blank Rome's representation. It focuses on the fact that J&J and BabyCenter waited several months before objecting to Blank Rome as counsel. We reject GSI's argument because a party's delay in raising a conflict-of-interest objection does not prohibit a court from deciding whether a conflict of interest exists. See, e.g., Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 574 (2d Cir. 1973) ("Since, as we have noted, disqualification is in the public interest, the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a breach of the Code of Professional Responsibility.").

19

waived by those provisions, Blank Rome did not contract around the corporate affiliate conflict at issue here.

GSI argues that the waiver provisions simply do not address Blank Rome's authority to accept representation that might raise a corporate affiliate conflict. Rather, it argues, the conflicts addressed in the waivers arise only if a J&J affiliate is a Blank Rome client in its own right at the time the law firm accepts representation adverse to that affiliate. If the affiliate is not separately a Blank Rome client at that time, GSI argues, the waiver provisions imply no limitation on the firm's ability to accept the adverse representation.

GSI argues that the Engagement Agreement gives Blank Rome carte blanche to accept representation adverse to J&J affiliates that are not separately Blank Rome clients. This argument relies entirely on the clause that states: "Unless otherwise agreed to in writing or we specifically undertake such additional representation at your request, we represent only the client named in the engagement letter and not its affiliates, subsidiaries, partners, joint venturers, employees, directors, officers, shareholders, members, owners, agencies, departments, or divisions."

We are unpersuaded. The waiver provisions unambiguously state that the contemplated conflicts arise out of Blank Rome's representation of J&J and third-parties in matters adverse to J&J

20

affiliates, and not out of some separate representation of those affiliates. The 2004 Letter states: "you [J&J] are aware of the conflict of interests that results from our representation of Kimberly-Clark and <u>Johnson & Johnson</u> but that notwithstanding <u>that</u> conflict of interest . . . you [J&J] consent to our representation of Johnson & Johnson and our simultaneous continued representation of Kimberly-Clark." (emphasis added). The 2005 Letter similarly provides: "[I]t is our belief that, if a conflict did exist, we would be permitted, subject to the consent being given via this letter, to represent <u>Johnson & Johnson</u>, while remaining available to represent the generic drug manufacturers in future patent-related proceedings involving Johnson & Johnson or any of its affiliates, subsidiaries or divisions." (emphasis added). The plain language of the Engagement Agreement thus contradicts GSI's argument that the waivers do not address corporate affiliate conflicts.

And because the waiver provisions do address corporate affiliate conflicts, GSI's construction of the Addendum also fails. If the broadly-worded, standard language of the Addendum actually waives all corporate affiliate conflicts, then there is no possible purpose served by the nonstandard waiver provisions waiving only certain corporate affiliate conflicts. Adopting GSI's construction of the Addendum as waiving all such conflicts would render the more specific and more limited waiver provisions

21

meaningless. We cannot accept such a construction. "The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract." Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008). Also, "specific language in a contract will prevail over general language where there is an inconsistency between two provisions." Id. Because GSI's construction of the broadly-worded, standard language of the Addendum would strip the remainder of the Engagement Agreement of any meaning, it violates basic canons of construction of contract law.

In any event, the relevant language in the Addendum states that Blank Rome represents only the named client and not unnamed "affiliates, subsidiaries, partners, joint venturers, employees, directors, officers, shareholders, members, owners, agencies, departments, or divisions." Construed as a waiver of all corporate affiliate conflicts involving the entities listed therein, this clause would raise a serious ethical problem. Specifically, Blank Rome cannot, consistent with its duty of loyalty to J&J, sue unincorporated departments or divisions of J&J. GSI conceded as much at oral argument but could not then explain why that same language grants Blank Rome authority to accept representation adverse to the other entities listed therein, such as affiliates. This troublesome aspect of GSI's construction only illustrates how hard GSI is straining to work a

22

broad waiver into language that simply is not plain enough or clear enough to support it.  There is, therefore, no waiver of the present corporate affiliate conflict.[4]

d)  <u>Blank Rome Has Not Shown an Absence of an Actual or Apparent Conflict</u>

Having concluded that Blank Rome's representation of GSI implicates the duty of loyalty owed to J&J, and having further concluded that Blank Rome did not contract around that duty, the question remains whether GSI can meet its heavy burden that representation of GSI should nonetheless be allowed.  As to this question, we find that GSI has failed to adduce any evidence showing that such representation will not result in an "actual or apparent conflict in loyalties."  <u>Cinema 5</u>, 528 F.2d at 1387.

CONCLUSION

For the foregoing reasons, we affirm.

---

[4]We of course need not and do not address issues that might arise with regard to a blanket waiver, without specifying types of claims or parties, of corporate affiliate conflicts.

23