# United States Court of Appeals for the Federal Circuit

---

**DR. FALK PHARMA GMBH,**
*Appellant*

**AND**

**SALIX PHARMACEUTICALS, INC., VALEANT
PHARMACEUTICALS INTERNATIONAL, INC.,**
*Intervenors*

**v.**

**GENERICO, LLC, FLAT LINE CAPITAL LLC,
MYLAN PHARMACEUTICALS INC.,**
*Appellees*

---

2017-2312

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2016-00297, IPR2016-01386, IPR2016-01409.

-------------------------------------------------------------------------

**SALIX PHARMACEUTICALS, INC., DR. FALK
PHARMA GMBH,**
*Plaintiffs-Appellants*

**v.**

**MYLAN PHARMACEUTICALS INC., MYLAN INC.,**
*Defendants-Appellees*

_____

2017-2636, 2018-1320

_____

Appeals from the United States District Court for the Northern District of West Virginia in No. 1:15-cv-00109-IMK, Judge Irene M. Keeley.

--------------------------------------------------------------------------

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC., SALIX PHARMACEUTICALS, INC., PROGENICS PHARMACEUTICALS, INC., WYETH LLC, FKA WYETH,**
*Plaintiffs-Appellees*

**v.**

**MYLAN PHARMACEUTICALS INC., MYLAN INC., MYLAN LABORATORIES LIMITED,**
*Defendants-Appellants*

**ACTAVIS LLC,**
*Defendant*

_____

2018-2097

_____

Appeal from the United States District Court for the District of New Jersey in Nos. 2:15-cv-08180-SRC-CLW, 2:15-cv-08353-SRC-CLW, 2:16-cv-00035-SRC-CLW, 2:16-cv-00889-SRC-CLW, 2:17-cv-06714-SRC-CLW, Judge Stanley R. Chesler.

---

**ON MOTIONS**

---

SEALED ORDER FILED: February 8, 2019
PUBLIC ORDER FILED: February 20, 2019*

---

MARY W. BOURKE, Womble Bond Dickinson (US) LLP, Wilmington, DE, argued for appellant and intervenors in 17-2312 and plaintiffs-appellants in 17-2636. Also represented by KRISTEN HEALEY CRAMER, DANA KATHRYN SEVERANCE, DANIEL M. ATTAWAY; JOHN W. COX, Atlanta, GA.

CHARLES E. LIPSEY, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Reston, VA, argued for plaintiffs-appellees Valeant Pharmaceuticals International, Inc., Salix Pharmaceuticals, Inc. in 18-2097. Also represented by BRYAN DINER, JUSTIN JAMES HASFORD, ESTHER LIM, KRISTI L. MCINTYRE, Washington, DC; JESSICA C. LEBEIS, Boston, MA.

MICHAEL ISIDORO VERDE, Katten Muchin Rosenman LLP, New York, NY, argued for appellee Mylan Pharmaceuticals Inc. in 17-2312, for defendants-appellees in 17-2636, and for defendants-appellants in 18-2097. Also represented by DEEPRO MUKERJEE, LANCE SODERSTROM, JONATHAN ROTENBERG, STEPHANIE MAE ROBERTS; HOWARD ROBERT RUBIN, RAJESH RAM SRINIVASAN, ERIC THOMAS WERLINGER, Washington, DC; ROBERT FLORENCE, SHARAD KOTAGIRI BIJANKI, MICHEAL L. BINNS, KAREN L. CARROLL,

---

*     This order was originally filed under seal and has been unsealed in full.

Parker Poe Adams & Bernstein LLP, Atlanta, GA; CHRISTOPHER THOMAS, Raleigh, NC.

––––––––––––––––

Before LOURIE, O'MALLEY, and REYNA, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

## O R D E R

At issue are three motions to disqualify Katten Muchin Rosenman LLP as counsel for Mylan Pharmaceuticals Inc. ("Mylan") in three appeals before this court. Valeant Pharmaceuticals International, Inc. ("Valeant-CA") and Salix Pharmaceuticals, Inc. ("Salix") move to disqualify in *Valeant Pharmaceuticals International, Inc. v. Mylan Pharmaceuticals Inc*., No. 2018-2097 ("*Valeant II*"), Salix moves to disqualify in *Salix Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, Nos. 2017-2636, 2018-1320 ("*Salix II*"), and Valeant-CA and Salix move to disqualify in *Dr. Falk Pharma GmbH v. GeneriCo, LLC*, No. 2017-2312 ("*Dr. Falk II*"). Because we find that Katten has an ongoing attorney-client relationship with Valeant-CA and its subsidiaries, including Salix, we conclude that Katten's representation of Mylan in these appeals presents concurrent conflicts of interest. Therefore, we grant the motions to disqualify.

## I. BACKGROUND

The motions to disqualify stem from Katten's representation of Bausch & Lomb Inc. ("Bausch & Lomb"), a corporate affiliate of Valeant-CA and Salix (collectively, "movants"), in a trademark litigation and its concurrent representation of Mylan, adverse to movants, in the pending appeals. Specifically, Katten signed an engagement letter with Bausch & Lomb that broadly defined Katten's client as any Valeant entity. Attorneys Deepro Mukerjee and Lance Soderstrom represented Mylan during various stages of the *Valeant*, *Salix*, and *Dr. Falk* proceedings—first, as attorneys from Alston & Bird LLP, but later, as

attorneys from Katten. The parties agree that Mukerjee and Soderstrom moved to Katten as of May 3, 2018. The parties, the engagement letter, and the procedural history are detailed below.

## A. The Parties

The parties relevant to the motions to disqualify include, Valeant-CA[1], Valeant Pharmaceuticals International ("Valeant-DE"), Salix, and Bausch & Lomb. Valeant-CA, a Canadian corporation and the movant in *Valeant II* and *Dr. Falk II*, is the ultimate parent of these entities. Specifically, Salix—a movant in all three appeals— is a wholly-owned subsidiary of Salix Pharmaceuticals, Limited, which is a wholly-owned subsidiary of Valeant-DE, which is an indirect, wholly-owned subsidiary of Valeant-CA. Bausch & Lomb is also an indirect subsidiary of Valeant-CA and an affiliate of the above-listed entities.

Valeant-CA contends that it has been a longstanding client of Katten, both directly and through its subsidiaries. Specifically, movants allege that a concurrent conflict arises in all three appeals from Katten's ongoing representation of Bausch & Lomb in a trademark matter regarding the mark MOISTURE EYES.[2] A partner in Katten's

---

[1] On July 26, 2018, counsel for Valeant-CA filed a notice of appearance in which it indicated that Valeant-CA had changed its name to "Bausch Health Companies Inc." *Valeant II*, ECF No. 30. All filings pertaining to the present motions refer to Bausch Health Companies Inc. by its former name of "Valeant Pharmaceuticals International, Inc." To avoid any confusion, we will also refer to Bausch Health Companies Inc. by its former name of Valeant Pharmaceuticals International, Inc." or, as abbreviated herein, "Valeant-CA" for purposes of this order.

[2] Movants also contend that a conflict arises from Katten's representation of another Valeant-CA subsidiary,

Chicago office has been representing Bausch & Lomb since 2001. Verde Decl. at ¶ 8 ("The only affiliate that Katten identified as a current client was Bausch & Lomb, Inc. . . . [A] partner in Katten's Chicago office[] has been representing Bausch & Lomb on trademark, copyright and advertising issues since 2001."). Mukerjee admits that he was aware that Katten represents Bausch & Lomb when he moved to the firm. Mukerjee Decl. at ¶ 17 ("During my discussions with Katten in late 2017, I was informed that Katten represents Bausch & Lomb, Inc.").

### B. The Engagement Letter & OC Guidelines

In the course of representing Bausch & Lomb, Katten signed a general engagement letter "governing the overall relationship between [Katten] and Valeant Pharmaceuticals International, Inc."—i.e., Valeant-CA. Gorman Decl. Ex. A, at 1. This engagement letter incorporates by reference Valeant's Outside Counsel Guidelines ("OC Guidelines" or "Annex 1").

Section 1.1 of the OC Guidelines states that "[t]hese guidelines will govern the relationship between Valeant Pharmaceuticals International[, i.e. Valeant-DE], its subsidiaries and affiliates. . . and outside counsel." Gorman Decl. Ex. A, at § 1.1. The terms of the OC Guidelines also require that Katten complete a conflict check "before representation of [Valeant-DE and its subsidiaries and affiliates] commences." Gorman Decl. Ex. A, at § 1.2. The terms further state that "[a]ny conflict of interest that is discovered in such a check or that develops during an ongoing

---

Valeant Pharmaceuticals North America ("VPNA"), in a counseling matter. The parties dispute whether this matter is truly ongoing. Because we find that a conflict arises from the Bausch & Lomb litigation, which is undisputedly ongoing, we need not decide whether this counseling matter involving VPNA also presents a conflict.

representation can only be approved, waived or otherwise cleared by the written agreement of the Valeant General Counsel." Gorman Decl. Ex. A, at § 1.2. The OC Guidelines do not define "conflict of interest," but state that "Valeant expects its firms to adhere to local rules and ethics rules relating to conflict of interest and client representation." Gorman Decl. Ex. A, at § 1.2.

The OC Guidelines also specify that "Valeant expects a significant degree of loyalty from its key external firms," defined as "firms with 12 month billings exceeding one million dollars." Gorman Decl. Ex. A, at § 1.2. These key firms should "not represent any party in any matters where such party's interests conflict with the interests of any Valeant entity." Gorman Decl. Ex. A, at § 1.2. Finally, the OC Guidelines state that they "will continue to apply unless revoked in writing by either party or modified by a subsequent letter signed by Valeant General Counsel and outside counsel." Gorman Decl. Ex. A, at § 1.5. Salix and Valeant-CA contend, and Mylan does not dispute, that the engagement letter, including the OC Guidelines, remains active under this provision.

## B. The Procedural History

### 1. *Valeant* proceedings

Valeant-CA and Salix sued Mylan on November 19, 2015, alleging that Mylan's submission of an abbreviated new drug application constituted an act of infringement under 35 U.S.C. § 271(e) of, inter alia, U.S. Patent No. 8,552,025 ("the '025 patent"). *Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 2:15-cv-08180-SRC-CLW (D.N.J. May 1, 2018) ("*Valeant I*"). Valeant-CA and Salix hold substantial rights in the '025 patent, which is listed in the *FDA's Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"). Valeant-CA and Salix moved for summary judgment of no invalidity for claim 8 of the '025 patent. The district court

granted the motion on May 1, 2018. *Valeant I*, ECF No. 300.

Mukerjee and Soderstrom, then at Alston & Bird, represented Mylan throughout the district court litigation. On May 3, 2018, Mylan notified the district court that Mukerjee and Soderstrom had left Alston & Bird to join Katten. On May 25, 2018, Valeant-CA filed a motion to disqualify Katten in the district court action. Mylan timely appealed the district court's summary judgment on June 22, 2018. Valeant-CA then filed a motion to disqualify Katten in this court on July 9, 2018, and the district court stayed a decision on the motion to disqualify pending before it. We stayed the parties' briefing on the merits in this appeal pending our decision on the motion. *Valeant II*, ECF No. 24.

### 2. *Salix* & *Dr. Falk* proceedings

*Salix* and *Dr. Falk* are related, parallel proceedings before a district court and the U.S. Patent Trial and Appeal Board ("Board"), respectively. *Salix Pharms., Inc. v. Mylan Pharms. Inc.*, 1:15-cv-00109-IMK (N.D. W. Va. Sept. 12, 2017) ("*Salix I*"); *GeneriCo, LLC v. Dr. Falk Pharma GmbH*, IPR2016-00297, 2017 WL 2211672 (P.T.A.B. May 19, 2017) ("*Dr. Falk I*"). Both proceedings involve U.S. Patent No. 8,865,688 ("the '688 patent"), which is owned by Dr. Falk and exclusively licensed to Salix.

In *Salix I*—the district court proceeding—Salix and Dr. Falk sued Mylan on June 26, 2015, alleging that Mylan's submission of an abbreviated new drug application constituted an act of infringement under § 271(e) of the '688 patent, which is listed in the Orange Book. Attorneys from Parker Poe represented Mylan throughout the district court litigation in *Salix I*. On April 22, 2017, a month after trial was complete, Mukerjee and Soderstrom, then of Alston & Bird, entered appearances in the district court action. After entering an appearance, Mukerjee took part in negotiating the stipulation to dismiss Mylan's

counterclaims.  The district court entered judgment on September 12, 2017, finding that Dr. Falk and Salix had failed to demonstrate by a preponderance of the evidence that Mylan's proposed product would infringe claim 1 of the '688 patent.

Salix appealed the judgment on September 27, 2017. Mukerjee and Soderstrom, who were still at Alston & Bird at that time, and five attorneys from Parker Poe all entered appearances before this court.  The parties completed briefing in February 2018.  On June 5, 2018, after Mukerjee and Soderstrom moved to Katten, Salix filed the present motion to disqualify.

In *Dr. Falk I*—the parallel Board proceeding—Mylan petitioned for inter partes review of claims 1 and 16 of the '688 patent.  Dr. Falk identified Salix as a real party in interest.  The Board granted institution and, in a final written decision dated May 19, 2017, found claims 1 and 16 of the '688 patent unpatentable as obvious.  Dr. Falk timely appealed that decision on July 18, 2017.  On appeal, Mukerjee and Soderstrom, then of Alston & Bird, entered appearances in that case for the first time.  The parties completed briefing in February 2018.  On June 5, 2018, after Mukerjee and Soderstrom moved to Katten, Salix and Valeant-CA moved to intervene and filed the present motion to disqualify.  On September 12, 2018, we granted the motion to intervene in an oral order just prior to commencing oral argument on the motions to disqualify.  *See* Oral Arg. at 0:39, available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-2097.mp3.

Movants contend that Katten's representation of Bausch & Lomb presents a concurrent conflict with Katten's representation of Mylan against Valeant-CA and Salix in either of two ways—first, they contend that the engagement letter creates an ongoing relationship between Katten and Valeant-CA, including all of its subsidiaries; and second, they contend that all Valeant-CA subsidiaries

are so interrelated that representation of one constitutes representation of all. Accordingly, Valeant-CA and Salix move to disqualify Katten as counsel in these appeals. Mylan opposes. We have jurisdiction over these appeals pursuant to 28 U.S.C. § 1295(a)(1), (4).

## II. DISCUSSION

We apply regional circuit law to disqualification matters. *Celgard, LLC v. LG Chem, Ltd.*, 594 F. App'x 669, 671 (Fed. Cir. 2014); *accord Atasi Corp. v. Seagate Tech.*, 847 F.2d 826, 829 (Fed. Cir. 1988). The relevant regional circuits in all three appeals apply the Model Rules of Professional Conduct.[3] Thus, all three motions allege violations of the same rule—Rule 1.7(a) of the Model Rules of Professional Conduct—which states:

> a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client . . . .

---

[3] In *Valeant*, the relevant regional circuit is the Third Circuit, which applies the professional conduct rules of the forum state. *See United States v. Miller*, 624 F.2d 1198, 1200 (3d Cir. 1980). The forum state, New Jersey, has adopted the Model Rules of Professional Conduct. N.J. Rule of Prof'l Conduct 1.7(a). In *Salix*, the relevant regional circuit is the Fourth Circuit, which applies the rules of professional conduct of the forum state. *See Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992). The forum state, West Virginia, has also adopted the Model Rules. W. Va. Rule of Prof'l Conduct 1.7(a). Finally, in *Dr. Falk*, the U.S. Patent and Trademark Office is the relevant forum and it has also adopted the Model Rules. 37 C.F.R. § 11.107(a).

When applying this rule, we look to "the total context, and not whether a party is named in a lawsuit," to assess "whether the adversity is sufficient to warrant disqualification." *Celgard*, 594 F. App'x at 672; *see also Freedom Wireless, Inc. v. Bos. Commc'ns Grp., Inc.*, No. 2006-1020, 2006 WL 8071423, at *2 (Fed. Cir. Mar. 20, 2006) ("The parties debate whether Freedom Wireless and Nextel are 'directly adverse' in these circumstances, where Nextel was not a named party to the initial lawsuit. We conclude, on the facts of the case, that the parties are directly adverse for purposes of analyzing a conflict of interest and determining the need for disqualification."). Indeed, Comment 34 to Rule 1.7, which addresses "organizational clients," states:

> A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. *See* Rule 1.13(a). Thus, the lawyer for an organization is not barred from accepting representation adverse to an affiliate in an unrelated matter, *unless the circumstances are such that the affiliate should also be considered a client of the lawyer*, there is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates, or the lawyer's obligations to either the organizational client or the new client are likely to limit materially the lawyer's representation of the other client.

Model Rules of Prof'l Conduct r. 1.7 cmt. 34 (Am. Bar Ass'n 2018) (emphasis added). Circumstances in which an affiliate is considered a client of a lawyer can arise by express agreement or when affiliates are so interrelated that representation of one constitutes representation of all. *GSI Commerce Sols., Inc. v. BabyCenter, LLC*, 618 F.3d 204, 210–12 (2d Cir. 2010) (finding that client and client's

corporate affiliate were so interrelated such that "representation adverse to a client's corporate affiliate implicate[d] the duty of loyalty owed to the client").

For the reasons stated below, Katten's representation of Mylan in *Valeant II, Salix II*, and *Dr. Falk II* adverse to the movants presents concurrent conflicts of interest with its representation of Bausch & Lomb in the ongoing trademark litigation under Rule 1.7.

## A. Katten's Representation of Mylan in *Valeant II*

Katten's representation of Mylan adverse to Valeant-CA and Salix in *Valeant II* and its ongoing representation of Bausch & Lomb, an affiliate of movants, presents a concurrent conflict of interest in violation of Rule 1.7. This is true even though movants are affiliates of Bausch & Lomb because the terms of the engagement letter and movants' demonstration of interrelatedness between the various Valeant affiliates presents circumstances such that movants should also be considered a client of Katten.

### 1. The Engagement Letter

Because the engagement letter creates an ongoing attorney-client relationship between the law firm, Katten, and its organizational clients, Valeant-CA and Salix, Katten's representation of Mylan adverse to movants in *Valeant II* gives rise to a concurrent conflict of interest under Rule 1.7. The express terms of the engagement letter and accompanying OC Guidelines indicate that Katten formed such a relationship with the movants when it signed the engagement letter for the Bausch & Lomb trademark litigation. Specifically, the engagement letter states that it "represents the general terms of engagement governing the overall relationship between [Katten] and Valeant Pharmaceuticals International, Inc.," i.e. Valeant-CA. Gorman Decl. Ex. A, at 1. This sentence, on its face, demonstrates that Katten's relationship extends beyond just Bausch & Lomb to at least Valeant-CA.

The OC Guidelines, which are expressly incorporated into the engagement letter, further extend the relationship to include any Valeant entity. Section 1.1 of the OC Guidelines states that the guidelines "will govern the relationship between Valeant[-DE], its subsidiaries and affiliates, . . . and outside counsel." Gorman Decl. Ex. A, at § 1.1. And section 1.2 of the OC Guidelines requires that Katten complete a conflict check "before representation of [Valeant-DE and its subsidiaries and affiliates] commences." Gorman Decl. Ex. A, at § 1.2. While these sections reference Valeant-DE and not Valeant-CA, the phrase "its subsidiaries and affiliates" encompasses Valeant-CA because Valeant-CA is the parent company, i.e. affiliate, of Valeant-DE. That same phrase also encompasses another movant in *Valeant II*, Salix, because Salix is a subsidiary of Valeant-DE. For these reasons, the engagement letter creates an ongoing relationship between Katten and both Valeant-CA and Salix.

Mylan argues that the engagement letter and OC Guidelines do not prevent Katten from representing a party that is adverse to Valeant-CA or Salix and that the terms of the letter actually authorize Katten to do so. In support of its position, Katten points to section 1.2 of the OC Guidelines, which provides that:

> Valeant expects a significant degree of loyalty from its key external firms (key firms being firms with 12 month billings exceeding one million dollars ($1,000,000)). *Such firms* should therefore not represent *any party* in *any matters* where such party's interests conflict with the interests of *any Valeant entity*.

Gorman Decl. Ex. A, at § 1.2 (emphases added).

Mylan contends that, "[t]he clear converse of this provision is that firms that are not 'key external firms,' may take on matters adverse to a Valeant entity as long as they otherwise comply with the [Rules of Professional

Conduct].” *Valeant II*, Mylan's Opp. at 11. Because it is undisputed that, despite having represented various Valeant-related entities in certain matters over the years, Katten is not a key firm, Mylan argues that Katten is not bound by the provisions of the engagement letter that broadly define the client as any Valeant entity.

We find this reading of the engagement letter to be irrational. Section 1.2 does not indirectly authorize Katten to represent parties adverse to Valeant-CA and Salix so long as Katten remains a non-key firm. Rather, section 1.2 expects a heightened degree of loyalty from key firms, requiring something more than mere adherence to the ethical rules. It states that key firms should not represent "any party" in "any matters" that would conflict with "any Valeant entity." Gorman Decl. Ex. A, at § 1.2. This reference to "any matters" encompasses, as Valeant-CA stated at oral argument, a "blunderbuss" limitation on key firms to avoid, not only matters that give rise to ethical conflicts, but also those that give rise to other types of conflicts. *See* Oral Arg. at 9:36. Other types of conflicts could include, for example, a matter involving the filing of an amicus brief that presents no ethical conflict under the rules of professional conduct, but that espouses a legal position contrary to one taken by a Valeant entity in another case. Thus, section 1.2 broadens the degree and type of loyalty expected from key firms.

But for firms generally, the OC Guidelines state that "Valeant expects its firms to adhere to local rules and ethics rules relating to conflict of interest and client representation." Gorman Decl. Ex. A, at § 1.2. This in no way narrows the definition of Katten's client to only Bausch & Lomb. Such a reading would be contrary to the various other provisions that define the client generally to include Valeant-CA and Salix. Mylan's argument fails.

Mylan also argues that the engagement letter creates a relationship between only Katten and Bausch & Lomb

because both Valeant-CA and Bausch & Lomb appear on the letterhead of the engagement letter and because Denis A. Polyn, who Mylan contends was a Bausch & Lomb attorney with a Bausch & Lomb email address, signed the engagement letter. But Mylan ignores the fact that Polyn was also the Vice President and Assistant General Counsel of Intellectual Property at Valeant-CA at that time. Gorman Decl. Ex. A, at 3. The fact that Polyn had a Bausch & Lomb email address and, according to Katten, was also a Bausch & Lomb attorney, does not mean that this engagement governed only the relationship between Katten and Bausch & Lomb. Rather, that the two entities appear to share a common letterhead and common employees only further underscores that Valeant-CA is a client of Katten because it demonstrates, as detailed below, that the two affiliates are interrelated. Thus, because the engagement letter creates an ongoing attorney-client relationship between Katten and Valeant-CA and its subsidiary Salix, Katten's representation of Mylan adverse to movants in *Valeant II* gives rise to a concurrent conflict of interest under Rule 1.7.

## 2. Interrelated Affiliates

Even if there were any plausible ambiguity in the engagement letter, Mylan's arguments would still fail because Valeant-CA, Salix, and Bausch & Lomb have demonstrated that the three entities are sufficiently interrelated to give rise to a corporate affiliate conflict.

The relevant regional circuits have not previously set out factors governing corporate interrelatedness in this context. In *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 211–12 (2d Cir. 2010), the Second Circuit considered the circumstances in which "representation adverse to a client's corporate affiliate implicates the duty of loyalty owed to the client." *Id.* at 210. It found that the factors relevant to this inquiry include "(i) the degree of operational commonality between affiliated entities, and (ii)

the extent to which one depends financially on the other." *Id.* Regarding the first factor, it noted that "courts have considered the extent to which entities rely on a common infrastructure," focusing "on shared or dependent control over legal and management issues," which "reflects the view that neither management nor in-house legal counsel should, without their consent, have to place their trust in outside counsel in one matter while opposing the same counsel in another." *Id.* Regarding the second factor, it noted that, "several courts have considered the extent to which an adverse outcome in the matter at issue would result in substantial and measurable loss to the client or its affiliate." *Id.* at 211. The Second Circuit applied these factors to find that a parent and its subsidiary were sufficiently interrelated to give rise to a corporate affiliate conflict.

In the absence of evidence to the contrary, we conclude that the relevant regional circuits would likely find the Second Circuit's reasoning persuasive and would therefore adopt its factors here. In particular, we find that they would agree that shared or dependent control over operational and legal matters between the affiliates is significant to the inquiry. Accordingly, we apply the Second Circuit's interrelatedness test to the facts in this case, and find that Valeant-CA, Salix, and Bausch & Lomb all share a high degree of operational commonality and are financially interdependent. Gorman Suppl. Decl. at ¶¶ 5, 6, 7, 10, 11, 12.

Valeant-CA and Bausch & Lomb "have a common infrastructure whereby [Valeant-CA] provides administrative and general support services to Bausch & Lomb. This includes "accounting, cash management, employee benefits, finance, human resources, travel, computer systems, insurance, and payroll services." Gorman Suppl. Decl. at ¶ 5. The two also "share the same in-house Valeant legal department." Gorman Suppl. Decl. at ¶ 6. Robert Gorman, the Vice President and Head of Global Intellectual

Property at Valeant-CA, is a member of the shared legal department and is "responsible for managing and controlling all of their IP related matters and disputes." Gorman Suppl. Decl. at ¶ 6. The current Vice President and Assistant General Counsel at Valeant-CA and former Vice President and Assistant General Counsel at Bausch & Lomb, John F. Lafave, states that, since his "transition to the current position at [Valeant-CA] in 2013, [he] still use[s his] email address at bausch.com." Lafave Suppl. Decl. at ¶¶ 1–2. Finally, Valeant-CA's public filings to the U.S. Securities and Exchange Commission ("SEC") from May 8, 2018 show that Bausch & Lomb contributed over $1 billion to Valeant-CA's reported revenues for the first quarter of 2018. Gorman Suppl. Decl. at ¶ 7. This all demonstrates that Valeant-CA and Bausch & Lomb share a high degree of operational commonality and are financially interdependent.

The same is true with regard to Salix and Valeant-CA. Salix and Valeant-CA also share an in-house legal department; indeed, Salix does not have its own legal department. Gorman Decl. at ¶ 6. Valeant-CA and Salix share a common infrastructure whereby Valeant-CA provides administrative and general support services to Salix, such as accounting, cash management, employee benefits, finance, human resources, travel, computer systems, insurance, and payroll services. Gorman Decl. at ¶ 5. The two entities are also financially interdependent because Salix's sales directly affect Valeant-CA's bottom line. Specifically, Valeant-CA's SEC filings demonstrate that its "revenue depends on Salix's gastrointestinal product sales," the sales of Salix products in the U.S. totaled $593 million of Valeant-CA's revenue from branded prescription products for the first quarter of 2018, and Salix's drug Apriso® is the second-highest revenue producer of Valeant-CA's branded prescription drugs. Gorman Decl. at ¶¶ 9–10. All of this demonstrates that Valeant-CA and Salix share a high degree of operational commonality and are financially

interdependent. For these reasons, we find that Valeant-CA, Bausch & Lomb, and Salix are sufficiently interrelated to give rise to a corporate affiliate conflict.

### B. Katten's Representation of Mylan in *Salix II* & *Dr. Falk II*

Katten's representation of Mylan in *Salix II* and in *Dr. Falk II* also gives rise to a concurrent conflict interest under Rule 1.7. As noted above, the engagement letter and accompanying OC Guidelines create an ongoing relationship between Katten and Salix. Specifically, section 1.1 of the OC Guidelines states that "[t]hese guidelines will govern the relationship between Valeant Pharmaceuticals International[, i.e. Valeant-DE], its subsidiaries and affiliates. . . and outside counsel." Gorman Decl. Ex. A, at § 1.1. Section 1.2 of the OC Guidelines requires that Katten complete a conflict check "before representation of [Valeant-DE and its subsidiaries and affiliates] commences." Gorman Decl. Ex. A, at § 1.2. Because Salix is a subsidiary of Valeant-DE, the term "subsidiaries" in sections 1.1 and 1.2 reasonably encompasses Salix. For these reasons, the engagement letter creates an ongoing relationship between Katten and Salix.

Again, even if there were an ambiguity in the engagement letter, which there is not, Katten's representation of Mylan adverse to Salix would still give rise to a conflict of interest. This is because Katten and Bausch & Lomb undisputedly have an attorney-client relationship and Bausch & Lomb, Salix, and Valeant-CA are sufficiently interrelated to give rise to a corporate affiliate conflict. *See supra* II.A.2. For the reasons stated above, Katten's representation of Mylan in *Salix II* and *Dr. Falk II* present conflicts of interest in violation of Rule 1.7.

### C. Additional Considerations

Mylan contends that, even if Katten has violated Rule 1.7, disqualification is not warranted under the

circumstances. Some district courts have held that disqualification is mandatory for violation of Rule 1.7. *See, e.g.*, *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 195 (D.N.J. 1989) (finding that disqualification should be mandatory for violation of Rule 1.7)). But other district courts have considered whether the totality of the circumstances—including the impact, nature, and degree of a conflict, the prejudice or hardship to either party, and which party was responsible for creating the conflict—warrants disqualification. *Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 53, 457–59 (D.N.J. 2010) (citing *Bos. Scientific Corp. v. Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 374 (D. Del. 2009); *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 583–84 (D. Del. 2001) (balancing factors to find disqualification unwarranted)). We have previously disqualified counsel without consideration of any factor, other than the fact of the ethical violation, but did so in a nonprecedential decision. *Freedom Wireless*, 2006 WL 8071423, at *3 ("Having concluded that a conflict of interest exists, we further conclude that disqualification . . . is warranted."). Here, we need not decide which approach is preferable because we find that, even if additional considerations were necessary, they all weigh in favor of disqualification.

Mylan will not face any prejudice or undue hardship as a result of disqualification. Indeed, because movants seek only prospective relief, Mylan will not need to submit new briefs in *Salix II* or in *Dr. Falk II*. And, Parker Poe, who represented Mylan in *Salix I* all the way through trial, remains counsel of record along with Katten in that appeal. In *Valeant II*, we stayed briefing on the merits, so Mylan now has the opportunity to seek new counsel to draft its briefs. Finally, we conclude that Katten's erection of an ethical wall is insufficient to resolve its violation of Rule 1.7. Katten claims that this wall cordons off Mukerjee and Soderstrom from Katten attorneys who have worked on matters for Bausch & Lomb, Valeant-CA, or affiliates in

the 18 months preceding May 7, 2018.  But this wall does nothing to address the concerns stemming from Katten's violation because it was created after Mukerjee and Soderstrom joined Katten, it applies only partially to work conducted within 18 months before May 7, 2018, and Katten never previously informed movants of any potential conflict.  We find that disqualification is warranted here, whether or not disqualification is mandatory under Rule 1.7.

## IV. CONCLUSION

For the reasons stated above, we find that Katten's representation of Bausch & Lomb in the trademark litigation presents a concurrent conflict of interest with its representation of Mylan in *Valeant II*, *Salix II*, and *Dr. Falk II*.  Under Rule 1.7, Katten may not represent Mylan in these appeals unless it previously obtained informed and written consent from both clients.  Katten has failed to do that here, and therefore has violated Rule 1.7.

Accordingly,

It Is Ordered That:

The motions to disqualify are granted.

FOR THE COURT

February 8, 2019                 /s/ Peter R. Marksteiner
        Date                          Peter R. Marksteiner
                                      Clerk of Court